875 F.Supp. 1410 (1995)
In re CLEARLY CANADIAN SECURITIES LITIGATION.
This Document Relates To All Actions.
Master File No. C-93-1037-VRW, MDL No. 993.
United States District Court, N.D. California.
February 7, 1995.
*1411 *1412 Neil A. Goteiner and Claudia A. Lewis, Farella, Braun & Martel, San Francisco, CA, for defendants.
William S. Lerach, Patrick J. Coughlin, John J. Stoia, Jr., Sharon T. Maier, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Alfred G. Yates, Jr., Alfred G. Yates, Jr. & Associates, Pittsburgh, PA, Joseph J. Tabacco, Jr., Stamell, Tabacco & Schager, San Francisco, CA, and Steve W. Berman, Hagens & Berman, Seattle, WA, for plaintiffs.

ORDER.
WALKER, District Judge.
Plaintiffs have filed a seventy-four page complaint with one-hundred-nineteen paragraphs, some with multiple subparts, purporting to allege a fraud-on-the-market securities class action against Clearly Canadian, Inc., and its officers and directors. Through the court's authority under FRCP 12(f), this order strikes the redundant and immaterial from these recitals to focus on any claims the facts at bar may present.
Plaintiffs claim that between August 3, 1992, and July 17, 1993, defendants artificially inflated the price of Clearly Canadian stock through a series of materially misleading statements, violating § 10(b) and Securities and Exchange Commission Rule 10b-5 and § 20(a) of the 1934 Securities and Exchange Act. Defendants move to dismiss plaintiffs' complaint on the grounds that it fails to allege sufficient facts to support plaintiffs' claim of scienter. Defendants also claim their statements were not materially misleading and that plaintiffs have not sufficiently pled loss causation. In addition, defendants oppose plaintiffs' motion for class certification.

I
Starting in 1988, Clearly Canadian pioneered the "New Age" segment of the soft-drink market, selling uncolored carbonated *1413 fruit-flavored beverages. Until 1992, the company had near exponential growth in its sales, with revenues jumping from approximately $33 million in 1990 to $127.4 million in 1991. Throughout this period of rapid growth and into the purported class period, Clearly Canadian and its officers and directors forecasted continued growth and high profitability. The company based its forecasts on past performance and publicly announced plans to expand its distribution network into Mexico, Europe and the United Kingdom.
Not all of the company's plans came to fruition. Indeed, the 1992 summer was cooler than expected, decreasing consumers' demand for all types of softdrinks. In addition, Clearly Canadian began to face competition from industry heavyweights like Coca-Cola Co. and PepsiCo., which each introduced competitive "New Age" products. On top of that, flavored ice tea drinks gained newfound popularity and an increased market presence, giving consumers additional choices for softdrinks. As a result, Clearly Canadian in the fourth quarter of 1992 and in early 1993 failed to meet earnings expectations, and its stock began a downward drift from around $17 per share at the beginning of the purported class period to approximately $6 per share at the period's end.
Plaintiffs allege that defendants made a number of materially misleading statements about Clearly Canadian during the purported class period that violated § 10(b) and SEC Rule 10b-5 and § 20(a) of the Securities and Exchange Act of 1934. At the beginning of the period, for example, Clearly Canadian announced a planned European stock offering expected to generate $35 million to $45 million, a fact that the markets apparently viewed favorably, as demonstrated by a 9.6 percent increase in the price of the company's shares. Plaintiffs contend this statement was misleading in that Clearly Canadian had not secured interest or backing for its proposed offering, which never occurred. Plaintiffs also complain about other optimistic statements. On September 1, 1992, Clearly Canadian's CEO, defendant Mason, stated that he expected sales, which analysts had predicted were dipping in the third quarter of 1992, to rebound in the fourth quarter. In the same statement, Mason also said he expected sales to increase 30 to 35 percent in 1993. As it turned out, sales and net income for the first half of 1993 were one half that of the first half of 1992. Nevertheless, in mid-October 1992, Mason announced plans to expand Clearly Canadian's distribution systems and roll out new flavored beverages, and he expressed confidence the new flavor would be "the most popular of the Company's current product line." SAC ¶ 69.
In conjunction with Clearly Canadian's November 4 announcement of its earnings for the third quarter of 1992, defendant Mason indicated that a portion of the company's sales increase for that quarter was attributable to an inventory build-up, which he believed would be depleted in the fourth quarter. Plaintiffs contend this statement was misleading in that Mason was aware that distributors were holding excess inventory and that Clearly Canadian's board had directed the company to reduce production through March 1993.
In a Barrons article published a month later, Clearly Canadian's COO, defendant Foreman, predicted fourth quarter revenues would be lower than expected because of an "inventory correction," but still in the $30-35 million range. Plaintiffs contend that internal sales reports available to Foreman indicated that sales through the end of November were less than $10 million and that his prediction of sales over $30 million lacked a reasonable basis based on past year's experience. When Clearly Canadian finally announced its sales for the full year 1992, fourth quarter sales turned out to be only around $15 million, and net income from operations dropped to $.07 per share, compared to $.19 per share for the same period in 1991. When adjusted for one-time charges related to the buyout of a distributorship agreement, Clearly Canadian actually posted a $9.9 million quarterly net loss of the last quarter of 1992. By the date of this announcement, in late February 1993, the price of Clearly Canadian stock had dropped to approximately $9 per share. Following the announcement of year end results for 1992, several analysts publicly commented *1414 they felt misled by Clearly Canadian's prior statements.
Finally, in late June 1993, Clearly Canadian's CFO, defendant Horton, allegedly assured analysts that sales for the quarter ending in June would be in line with expectations of five-and-a-half to six million cases, when in fact, as of the end of May, Horton allegedly knew quarterly sales had been just over 3 million cases. Plaintiffs argue Horton had no reasonable basis for assuming the company would meet his prediction. SAC ¶ 96. When Clearly Canadian finally announced its earnings for the quarter ending in June, they turned out to be lower than some analysts had predicted. Following this announcement on July 19, the last day of the purported class period, Clearly Canadian's stock dropped to $6 per share.
Plaintiffs allege that in addition to making these misstatements, individual defendants engaged in illegal insider trading of the company's shares by trading while in possession of material nonpublic information. Plaintiffs also point out that the company repurchased its own shares during the purported class period, allegedly to boost the firm's stock price and allow individual defendants to sell their own shares at a profit. In addition, plaintiffs note that three times during the purported class period Clearly Canadian reduced the exercise price of options held by corporate insiders, allegedly to enable individual defendants to profit from their misstatements notwithstanding the overall erosion of the value of the company's shares.

II
The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2). In addition, allegations of fraud must be pled with particularity. Id. Rule 9(b). Courts are generally familiar with what to expect in fraud complaints involving direct or face-to-face transactions. Courts find less guidance about what to look for in a complaint such as the one at bar which claims a fraud on a securities market; this cause of action originated only recently and the opportunity for courts to develop pleading standards has been limited.[1]
In assessing the adequacy of a complaint for securities market fraud under the Federal Rules, it is helpful to consider the information available to, and practical difficulties facing, a lawyer seeking to plead a claim of that type. As Professors Wright and Miller explain, "[w]hat constitutes a short and plain statement must be determined in each case on the basis of the nature of the action, the relief sought, and the respective positions of the parties in terms of the availability of information." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1217 (2d Ed. 1990).
Drafting a complaint for securities market fraud is at once both easier and more difficult than drafting a complaint for direct fraud. Securities market fraud is simpler to plead than direct fraud in that the former requires fewer elements than the latter. To state a claim for direct securities fraud under Rule 10b-5, a pleader must allege: (A) a misstatement or an omission which renders misleading a statement actually made, (B) materiality of the misstatement or omission, (C) scienter on the part of those making the statement or omitting the information, (D) reliance by the plaintiff if a misstatement is alleged, (E) damages suffered by the plaintiff and (F) a causal link between the damages suffered and the misstatement or omission. See Thomas Lee Hazen, The Law Securities Regulation § 13.2 (2d ed. 1990).
If the plaintiff sues under the fraud-on-the-market theory, however, reliance (element D) need no longer be pled. A securities market fraud case proceeds on the assumption that investors rely on the integrity of the market to establish a fair and correct price for openly traded securities. Hence, there is no need to prove that individual *1415 investors relied on any particular information about the prospects of the security's issuer. Basic, Inc. v. Levinson, 485 U.S. 224, 244-47, 108 S.Ct. 978, 990-91, 99 L.Ed.2d 194 (1988); In re Seagate Technology II Sec. Litig., 843 F.Supp. 1341, 1355 (N.D.Cal.1994). Moreover, an allegation that the defendants' misstatement distorted the market price of the security itself satisfies three of the elements required to state a claim of direct fraud (i.e., elements B, E and F). See Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell & Jeffry M. Netter, Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson, 77 Va.L.Rev. 1017 (1991). Given the presumption of reliance, when an alleged misstatement or omission occurs (element A) and affects the trading price of the security on the open market, this price effect denotes the materiality of the misinformation put into the market, satisfying element (B). The price effect, it is theorized, also furnishes elements (E) and (F). Because defendants misled the market, the market, according to the theory, was unable correctly to value the security, whose price diverged from its true value, leading plaintiffs to overpay for (or in the rare case undersell[2]) the security, causing plaintiffs' damages. The amount of those damages is simply the amount of the divergence.[3] See Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1341-42 (9th Cir.1976) (Sneed, J., concurring).
A complaint for market fraud therefore requires only two distinct elements, (A) and (C) above, along with an allegation that the price of the security responded significantly to defendants' alleged misstatements. This simplification greatly reduces the burden on the pleader drafting his complaint, especially since the price effect on the security of the alleged misrepresentation is usually known at the time the complaint is drafted.[4] The basic facts pertaining to elements (A) and (C) may also be known when the complaint is drafted. Indeed, these facts are frequently disseminated by the numerous media which cover and compile business and economic news and information and thus can be alleged with the particularity required by FRCP 9(b) without much difficulty. Damages, which need not be pled with specificity, can nevertheless also be precisely calculated because the effect of the allegedly misstated or omitted information can be observed in the price reaction of the security when the true facts about the issuer become known to the market. Although the price distortion will not necessarily equate with the price shock which triggered the lawsuit, see Baruch Lev & Meiring de Villiers, Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis, 47 Stan.L.Rev. 7 (1994), econometric analysis of publicly available price and volume data will enable the price distortion to be calculated early in the litigation, perhaps even before the complaint is filed.
While the availability of much of the information needed to plead a market fraud claim eases the pleader's task, it also constrains what he can responsibly assert in the complaint. In an omissions case, for example, the information that moved the price of the security is that which defendants should allegedly have earlier disclosed, but did not. The pleader when drafting the complaint will generally not know with precision what information defendants knew and when they knew *1416 it. This contrasts with a misstatement case, in which the timing and falsity of the misinformation put into the market is evident. Hence, although a pleader will know in both a misstatement case and an omissions case when the market fraud ended, in an omissions case it may not be readily apparent when the fraud being alleged began. Similarly, the identity of those responsible for the false statement or misleading omission may not be fully known when drafting the pleading. Again, this is especially likely in an omissions case.
Another constraint is that the alleged misstatements or omissions must match temporally with the pattern of the security's price behavior. For a misstatement to be actionable, it must have an effect on the price of the security in the market. Similarly, an omission is actionable only if it causes the value line of the security to diverge from the price line. See Green, 541 F.2d at 1341; Seagate II, 843 F.Supp. 1341, 1347 (N.D.Cal. 1994). No matter how untrue a statement and no matter the malignancy with which it is uttered or with which information is concealed, no market fraud is committed unless the statement or omission moves the price of the security to depart from its true value. Often a pleader will be unable to match the misstatements or omissions that he suspects with price behavior that suggests that the market was fooled or that the information distorted was material to investors' evaluation of the company's prospects.
Finally, the misstatement or omission whose correction caused the precipitous price movement that triggered the litigation must be the subject of defendants' alleged fraud. If, for example, the news that rocked the security price was of disappointing earnings, then the pleader must find a misstatement about earnings put into the market by defendants or identify material information about earnings that defendants were aware of and concealed.
From this discussion, it should be clear that pleading market fraud under FRCP 8(a)(2) does not require elaborate or lengthy recitals. The core of a market fraud case is the price effect of the alleged misrepresentation or omission, measured when the "truth" entered the market. In addition, in a misstatement case, one would expect a pleader to include specific information about the alleged misstatement, such as who made it, when it was made and why it was misleading. In an omissions case, however, the specifics of exactly who said (or did not say) what, and what they knew when, can be alleged more generally, to be illuminated through discovery.
When confronted with a complaint that runs afoul of Rule 8(a)(2), the court has two options. First, the court may dismiss the complaint. Kuehl v. FDIC, 8 F.3d 905 (1st Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994); Salahuddin v. Cuomo, 861 F.2d 40 (2d Cir.1988); Lasky v. Shearson Lehman Brothers, Inc., 139 F.R.D. 597 (S.D.N.Y.1991). Dismissal under these circumstances is usually without prejudice, although the more draconian step of dismissal with prejudice may be appropriate in particular cases. Kuehl, 8 F.3d at 908-09.
A second option is for the court to use its power under FRCP 12(f) to order stricken from the complaint redundant or immaterial matter.[5] This option is particularly appropriate where, as here, the complaint describes a fraud on the market, and plaintiff lawyers, able and experienced securities litigators, have had years to develop facts into a coherent theory of fraud and have already amended their complaint twice. Furthermore, defendants have moved the court to dismiss plaintiffs' complaint under FRCP 12(b)(6). Under these circumstances, dismissal for failure to comply with Rule 8(a)(2) will only invite a pared down amended complaint and a new round of motions to dismiss. In the interests of efficiency, then, the court, if it denies defendants' motion to dismiss, should nevertheless strike the surplusage of plaintiffs' complaint to bring it in compliance with Rule 8(a)(2). Because plaintiffs' complaint does not comply with Rule 8(a)(2), and for the reasons developed in connection with the court's discussion of the merits of defendants' motion, the court believes such action *1417 is necessary in the case at bar and undertakes to do so in Part IV of this order.

III
Defendants seek dismissal of plaintiffs' complaint under FRCP 12(b)(6). The court may grant defendants' motion if plaintiffs' complaint alleges no set of facts showing plaintiff is entitled to relief. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." In re VeriFone Sec. Litig., 11 F.3d 865, 868 (9th Cir.1993). In addition, allegations of securities fraud must meet the particularity requirements of FRCP 9(b). Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir.1987).

A
Defendants' first argument for dismissal is that plaintiffs have failed to allege facts that demonstrate defendants' scienter. Scienter is a state of mind evidencing an intent to defraud. Under Ninth Circuit case law, reckless conduct by defendants satisfies the scienter requirement. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir.1990), cert. denied, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). A company's failure to meet its forecasts is not enough to support an inference of scienter. Marx v. Computer Sciences Corp., 507 F.2d 485, 490 (9th Cir.1974). Rather, plaintiffs must demonstrate that, at the time the forecasts were made, defendants knowingly or recklessly failed to reveal material information in their possession, rendering the forecasts misleading. Scienter may be pled generally, FRCP 9(b); In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir.1994), and plaintiffs can infer scienter at the pleading stage by claiming defendants had a motive and opportunity to profit from the alleged fraud. In re Wells Fargo Sec. Litig., 12 F.3d 922, 931 (9th Cir.1993).
The thrust of defendants' scienter argument is directed towards plaintiffs' apparent inability to describe a motive for defendants to have engaged in the fraud of which they are accused. Defendants point out that individual corporate insiders engaged in only small amounts of trading during the purported class period and that none of this trading coincided with alleged fraudulent misstatements. Also, defendants argue that reducing the exercise price of options held by insiders is simply an appropriate reaction to a decline in the value of the company's shares and does not support an inference of scienter. Finally, defendants note that a company's decision to invest in itself by repurchasing its shares is inconsistent with an intent to defraud.
These arguments are not sufficient to demonstrate that plaintiffs have failed to allege facts from which the court can infer defendants acted with scienter. Plaintiffs' second amended complaint contains specific allegations that defendants made public statements about Clearly Canadian either knowing those statements to be false or with reckless disregard for their falsity. For example, plaintiffs contend that defendants Foreman and Horton made two predictions about Clearly Canadian's short term performance while in possession of internal reports that showed their predictions lacked a reasonable basis. See SAC ¶¶ 75-76, 96. Other examples of allegations that plead facts supporting scienter are discussed below. While it is unclear to the court what motive defendants may have had for making such allegedly misleading statements, under the Ninth Circuit's interpretation of the securities laws, these allegations are sufficient to support plaintiffs' claim of scienter at the pleading stage. See GlenFed, 42 F.3d at 1547 ("Rule 9(b) requires particularized allegations of the circumstances constituting fraud."); Hollinger, 914 F.2d at 1569-70; see also In re Time Warner Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) (noting scienter can be supported by claims of conscious disregard for the truth). Defendants' motion to dismiss plaintiffs' complaint for failure to allege facts supporting scienter must therefore be DENIED.

B
Defendants also contend Clearly Canadian's statements were not materially misleading as a matter of law. Defendants offer *1418 three versions of this argument. First, Clearly Canadian adequately disclosed the information plaintiffs claim was concealed. Second, the company's descriptions of its business strategy did not create an impression of future growth and therefore did not mislead the market. Last, the statements plaintiffs complain were misleading were simply vague expressions of optimism that are not actionable as a matter of law. While correct as far as they go, these arguments do not go so far as to justify granting defendants' motion to dismiss.
When a corporation chooses to disclose information, it must reveal any information in its possession necessary to render the disclosure not misleading. This rule applies to statements of future projections as well as statements of past performance. In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Thus, even if the investment community knew that demand for softdrinks had decreased during the 1992 summer because of bad weather and that the entry of competitors like Coke and the proliferation in the market of flavored iced tea drinks would decrease demand for Clearly Canadian's product, defendants' forecasts could still have been materially misleading if one of three implicit factual assertions contained in the forecasts were false: (1) that the statement was genuinely believed; (2) that there was a reasonable basis for the belief; and (3) that the speaker was not aware of any undisclosed facts that undermined the accuracy of the statements. Id.
Plaintiffs make five allegations that meet this test. First is the company's announcement of its later-aborted European stock offering, which plaintiffs allege was made when defendants knew they lacked sufficient backing. SAC ¶ 65. Second, on November 4, 1992, defendant Mason commented that he expected sales to rebound. According to plaintiffs' complaint, when Mason made this statement he already knew that the Clearly Canadian's board had directed the company to reduce production due to the amount of inventory held by distributors. Id. ¶ 72. Third, defendant Foreman's statement in a December 7, 1992, article in Barrons predicted sales for the quarter ending in December 1992 would be upwards of $30 million. Plaintiffs allege that when Foreman made this statement, he was aware of internal reports that showed the company could not reach this level of sales. Id. ¶¶ 75-76. Fourth, on February 8, 1993, defendant Foreman was quoted as predicting that Clearly Canadian would "grow double the market in 1993"; again, plaintiffs contend Foreman was aware of information that will prove that prediction lacked a reasonable basis. Id. ¶ 78. Finally, plaintiffs claim defendant Horton, in June 1993, misled the market by predicting sales over 5.5 million cases for the quarter when he allegedly knew the figures would turn out much lower. Id. ¶ 96.
From plaintiffs' complaint, one can infer that, if these statements were false, they caused the price of Clearly Canadian's stock to diverge from its true value. Following disclosure of Clearly Canadian's plans for a European stock offering, the price of its NASDAQ-traded stock increased 9.6 percent. Id ¶ 65. And while Clearly Canadian's stock price declined from over $17 per share in October 1992 to $9 per share in February 1993, it is not unreasonable to assume (and, indeed, on defendants' motion to dismiss the court must assume) that, had defendants not made their alleged misstatements, Clearly Canadian's stock would have dropped in price even more rapidly. By the end of the purported class period, when, according to plaintiffs, the "truth" about Clearly Canadian's prospects were finally known to the market, its stock was trading at approximately $6 per share.
Not all of defendants' statements during the purported class period are actionable, however. Defendants properly point out that, in a fraud-on-the-market case, they cannot be liable as a matter of law for failing to include in their disclosures information already widely known to the market. Apple Computer, 886 F.2d at 1115. Under the fraud-on-the-market theory, plaintiffs rely on the integrity of the market, which is by assumption efficient, meaning that the market rapidly incorporates into the price of a security all available material information. *1419 If information about entry of competitors into the New Age softdrink market was available to the market and materially relevant to the price of Clearly Canadian stock, defendants' failure to disclose that information cannot have affected the price of Clearly Canadian stock. Additional disclosure by defendants would not have added material information to the market. Put differently, the materiality requirement of Rule 10b-5 judges a statement in light of the total mix of information available to the market. TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). If a disclosure by the defendants would not have altered this total mix of information, it cannot be material and is therefore not actionable. In re Convergent Technologies Sec. Litig., 948 F.2d 507, 513 (9th Cir.1991).
From plaintiffs' own assertions, it is clear that the financial markets were well aware of many of the troubles Clearly Canadian faced, notwithstanding defendants' alleged efforts to hide their problems. For example, on August 3, 1992, a Dow Jones Newswire discussion of Clearly Canadian's stock performance noted that the company's strong second quarter 1992 results "eased the fears of some who thought that increasing competition in the so-called `new age' beverage category would cut into the company's results." SAC ¶ 65. Thus, even at the beginning of the purported class period, the markets were aware of the threat increased competition posed to Clearly Canadian's performance. Analysts began lowering their estimates of Clearly Canadian's earnings almost immediately thereafter, just one month into the purported class period, id. ¶ 66, and defendant Mason acknowledged that reduced expectations were appropriate, given the cool summer weather. Id. ¶ 67. Three months later, in November 1992, securities analysts probed defendant Foreman with inquiries about the effect increased competition would have on Clearly Canadian's sales, indicating competition continued to be a topic of concern in the financial markets. As a result of the market's unease about Clearly Canadian's prospects, its stock price declined from almost $17 in August 1992 to around $10 in November.
Plaintiffs also contend that defendants' vague statements of general optimism are actionable under the securities laws. The investment community understands that long range plans may not come to fruition and that corporate insiders' naturally optimistic hopes are often inflated, however. Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir.1989); In re VeriFone Sec. Litig., 784 F.Supp. 1471, 1481 (N.D.Cal. 1992), aff'd, 11 F.3d 865 (9th Cir.1993). Thus, statements such as defendant Foreman's that the company is well-positioned for the future or that it will be a $1 billion dollar company soon after the turn of the century, or defendant Mason's claim that the company's distribution agreements are steps towards becoming a global leader are not actionable as a matter of law. Indeed, some of these long-term predictions may eventually come true.
Nevertheless, plaintiffs' complaint contains sufficient allegations of material misstatements to support 10b-5 liability. Accordingly, defendants' motion to dismiss plaintiffs' claims for failing to allege material misrepresentations is DENIED.

C
Defendants' final argument for dismissal is that plaintiffs have failed to allege facts that indicate plaintiffs will be able to prove the causation element of 10b-5 liability. The court disagrees.
In a fraud-on-the-market case, causation becomes closely intertwined with plaintiffs' reliance on the integrity of the market. See Part II, supra; see also Seagate II, 843 F.Supp. at 1347 n. 5; VeriFone, 784 F.Supp. at 1479. This is especially so in a case such as this, where defendants are accused of misleading the market with fraudulently optimistic forecasts. Plaintiffs can prove loss causation by demonstrating that the price of Clearly Canadian stock was artificially inflated by defendants' misstatements when plaintiffs purchased their shares. The loss suffered by plaintiffs is the difference between the "true" value of the stock and its artificially inflated price at the time of purchase. Wool, 818 F.2d at 1437.
*1420 Defendants argue that plaintiffs' complaint fails to plead facts demonstrating causation because plaintiffs have not specifically linked any decline in the price of Clearly Canadian shares with a particular misstatement. In an omissions case, however, this is hardly surprising. As discussed in Part IIIB, supra, it is not unreasonable to assume at this stage in the litigation that plaintiffs may be able to demonstrate that but for defendants' alleged material omissions, the price of Clearly Canadian shares would have decreased faster than it did. Of course, plaintiffs will have to come forward with evidence on this point, but that is an issue more properly addressed in a motion for summary judgment. Defendants' motion to dismiss plaintiffs' claim for failure adequately to plead loss causation is DENIED.

D
To make out a claim of controlling person liability under § 20(a) of the Securities Exchange Act of 1934, plaintiffs must allege that (1) individual defendants had the power to control or influence Clearly Canadian and (2) individual defendants were culpable participants in the company's alleged fraudulent acts. Wool, 818 F.2d at 1441-42. "[W]here, as here, the corporate officers are a narrowly defined group charged with day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation." Id.
Review of plaintiffs' second amended complaint reveals adequate allegations to support the first element of plaintiffs' § 20(a) claim. As discussed above, plaintiffs' complaint also sufficiently alleges that defendants Mason, Foreman and Horton all made culpable misstatements to support the second element of § 20(a) liability. Furthermore, plaintiffs' complaint contains sufficient allegations of a conspiracy and acts in furtherance to support claims against the remaining individual defendants. Defendants' motion to dismiss plaintiffs' § 20(a) claim is therefore DENIED.

IV
Denial of defendants' motion to dismiss does not mean this litigation must proceed with plaintiffs' complaint as it stands. FRCP 8(a)(2) requires a "short and plain statement of the claim showing the pleader is entitled to relief." Plaintiffs' seventy-four page complaint is neither short nor plain. Rather, it is replete with irrelevant and immaterial recitals that have no part in this litigation. Inclusion of such material places an unnecessary burden on defendants and the court to sift through the irrelevant matter to identify the basis of plaintiffs' claims. Ultimately, such pleading is self-defeating for plaintiffs, as it merely slows down the litigation from reaching the merits of plaintiffs' claims.
Included in plaintiffs' second amended complaint, for example, are ¶¶ 41-64 and 98-107, which, respectively, describe in fifteen pages statements allegedly made by defendants before and after the purported class period. Similarly, ¶ 108, which describes alleged insider trading by individual defendants, lists on five pages trading activity that occurred overwhelmingly outside the purported class period. As the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made or insider trading allegedly occurring before or after the purported class period are irrelevant to plaintiffs' fraud claims. Pursuant to Rule 12(f), the court therefore ORDERS STRICKEN from plaintiffs' complaint ¶¶ 41-64 and 98-107 and any transactions listed in ¶ 108 that occurred before August 3, 1992, or after July 19, 1993, plaintiffs' purported class period. The court also ORDERS STRICKEN ¶¶ 3, 4, 5 and 6, which discuss only statements allegedly made before the purported class period.
In addition, the court ORDERS STRICKEN ¶ 109, which purports to list in thirty-nine subparagraphs information known to or recklessly disregarded by defendants when making their allegedly misleading statements. For the reasons discussed in Part III, supra, certain of ¶¶ 65-97 describe plaintiffs' claims with adequate specificity and detail to satisfy plaintiffs' pleading requirements under Rules 8 and 9(b), rendering the *1421 additional piling on of vague so-called "facts" in ¶ 109 unnecessary. Moreover, ¶ 109 fails to show how any of the allegedly adverse facts it recites rendered false or materially misleading any statements made by defendants. Nor does ¶ 109 identify facts which imposed on defendants a duty to disclose the information it contains.
Finally, the court ORDERS STRICKEN as redundant and immaterial ¶¶ 66-71, 73, 77, 80-88 and 90-95. Paragraph 66 states only that an analyst lowered his forecast for Clearly Canadian's earnings. There is no allegation, however, that the analyst's statement was false or misleading, or that defendants "sufficiently entangled [themselves] with the analysts' forecasts to render those projections attributable to [them]." Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.1980). Accordingly, ¶ 66, even if true, is not actionable. The same can be said for ¶¶ 83-85 (describing analysts' comments about Clearly Canadian). Paragraph 77, which contains no factual allegations, is immaterial.
Paragraphs 67-71, 73, 80-82, 86-88 and 90-95 all fail to comply with FRCP 9(b). To satisfy Rule 9(b)'s requirements for pleading securities fraud, "plaintiff[s] must set forth what is false or misleading about a statement, and why it is false." GlenFed, 42 F.3d at 1548 (emphases added). While all of these paragraphs from plaintiffs' second amended complaint discuss statements by defendants, none says anything about why those statements were false when made. For example, ¶ 71 states:
On October 29, 1992, Clearly Canadian announced that it had entered into agreements to distribute Clearly Canadian products in Mexico and the Caribbean. In the announcement, defendant Foreman, Chief Operating Officer stated: "These agreements are part of Clearly Canadian's goal of quality on its worldwide leadership position within the rapidly growing New Age beverage industry. Under the terms of the agreement, the distributors have committed to 1,000,000 cases and 600,000 cases in the first year of the agreements." In fact, distributors appear to have taken significantly less product during the first year period identified.
SAC ¶ 71. This paragraph alleges that defendant Foreman made a statement that later turned out not to be true. There is no indication, however, about what was false or misleading about the statement when made. GlenFed, 42 F.3d at 1549 ("[A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made."). The statement describes an agreement; to satisfy Rule 9(b), plaintiffs must allege that the description of the agreement was itself false or misleading, not simply that facts did not unfold as hoped. Paragraph 86 provides a similar example. The paragraph merely states that defendants "asserted that Clearly Canadian was about to be delisted from the Vancouver Stock Exchange and listed on the New York Stock Exchange * * *. Clearly Canadian was never listed on the New York Stock Exchange." Again, there is no indication that defendants' assertion was false when made. Moreover, ¶ 86 fails to identify the time and place of this alleged statement, failing the other requirements of Rule 9(b). GlenFed, 42 F.3d at 1547-48.
Plaintiffs cannot, as they have attempted to do, simply list a number of defendants' statements and then elsewhere (in this case ¶ 109) describe in vague terms why these statements were false. Allegations must be focused on specific falsehoods. Otherwise, by filing an easily drafted complaint, plaintiffs could impose significant discovery costs on defendants and burden the courts with needless litigation.
The court recognizes, as discussed in Part II, supra, that often information related to the falsity of a defendant's statements will not be known at the time of pleading. In this situation, however, the proper pleading practice is exemplified by ¶¶ 75-76 of plaintiffs' second amended complaint, which allege that defendant Foreman made a particular prediction (fourth quarter revenues would be $30-$35 million), but that when he made that prediction he possessed internal sales reports showing his prediction was unreasonable. Such specificity lays the foundation for focused *1422 discovery about what defendant Forman knew when he made his prediction and allows the parties to determine efficiently whether the prediction had a reasonable basis and, therefore, whether defendants can be liable for securities fraud.

V
Plaintiffs seek certification that this fraud-on-the-market securities litigation may be maintained as a class action under FRCP 23. In In re Seagate Technology II Securities Litigation, 843 F.Supp. 1341, 1366 (N.D.Cal.1994), the court required plaintiffs seeking class certification in a fraud-on-the-market securities action to provide evidence on the extent of seller-purchaser and equity conflicts. The court believes that such information is necessary to determine the adequacy of representation in fraud-on-the-market cases, as the court must do under Rule 23. Id. at 1359-64.
Plaintiff lawyers in the case at bar, instead of presenting evidence to address the court's concerns, take issue with the court's Seagate II order. For the reason's detailed in Seagate II, the court believes seller-purchaser conflicts and conflicts between equity-holding and non-equity-holding class members raise serious questions about the adequacy of representation of all would-be class members. As plaintiffs have submitted no evidence to the court on these issues, the court is not in a position to determine whether class certification is proper. Accordingly, plaintiffs' motion for class certification is DENIED WITHOUT PREJUDICE.
Counsel shall appear for a status and scheduling conference on March 17, 1995, at 2:00 p.m.
IT IS SO ORDERED.
NOTES
[1] The fraud-on-the-market theory received the Supreme Court's apparent endorsement, through a plurality opinion in Basic, Inc. v. Levinson, 485 U.S. 224, 229-30, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988), only seven years ago. The first application of the fraud-on-the-market theory by a court of appeals was in the Ninth Circuit's decision in Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).
[2] In Basic, for example, defendants were accused of withholding good news from the market.
[3] One of the anomalous features of a claim for market fraud is that, because necessarily each purchase in the market corresponds to a sale, as many participants benefit from the fraud as are damaged. The usual measure of damage ignores the benefits and focuses solely on the losses. See Frank H. Easterbrook & Daniel R. Fischel, Optimal Damages in Securities Cases, 52 U.Chi.L.Rev. 611, 635 (1985).
[4] Some commentators have observed that fraud-on-the-market securities class actions frequently follow the precipitous movement in the price of the security involved. See, e.g., Janet Cooper Alexander, Do the Merits Matter? A Study of Settlements in Securities Class Actions, 43 Stan. L.Rev. 497, 513 & n 48. Significant movements in the price of a security serve as a useful screen for meritorious securities fraud case, however, and not all major price movements are followed by lawsuits. See Joseph A. Grundfest, Why Disimply?, 108 Harv.L.Rev. 727, 734-35 (1995) (providing an insightful discussion about the relationship between major changes in a security's price and plaintiff lawyers' incentives).
[5] Rule 12(f) authorizes the court to act "upon the court's own initiative at any time." FRCP 12(f).