In re 2THEMART.COM, INC.
SECURITIES LITIGATION

This Document Relates To: All Actions

No. SACV 99–1127 DOCANX.

United States District Court,
C.D. California.

July 17, 2000.

Michael D. Braun, Stull Stull & Brody, Los Angeles, CA, Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, Lynn L. Sarko, Elizabeth A. Leland, Keller Rohrback Law Offices, Seattle, WA, for Mary Ellen Harrington.

Keith B. Bardellini, Erin A. Owen, Donald S. Lee, Buchalter Nemer Fields & Younger, Los Angeles, CA, for Defendants.

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE

CARTER, District Judge.

#### I. Introduction

This matter comes before the Court on Defendants' motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6) and motion to strike pursuant to Federal Rule of Civil Procedure 12(f). Based on the materials and oral argument submitted by the parties, it appears that Plaintiffs' Consolidated Amended Complaint (hereinafter, "complaint") adequately states a claim for securities fraud upon which relief may be granted, and that the subject matter at issue in the motion to strike may be at issue in the case. Therefore, the Court denies both motions.

## II. Factual Background

Defendant, 2TheMart.com, Inc. (hereinafter, "2TheMart"), was conceived in January 1999 by Defendants Magliarditi and Rebeil as a company that was to launch an e-commerce auction web site in direct competition to other auction web sites such as eBay.com. (Compl. at ¶ 2.) The web site was intended to be the core money-making strategy of the company. On January 19, 1999, the defendants announced the acquisition of CD Rom Yearbook, Inc., a publicly traded entity. As a result, 2TheMart acquired CD Rom Yearbook, Inc. as a shell company, changed the name of the company to 2TheMart.com, Inc., and became a publicly traded company on the NASD Electronic Bulletin Board identified as "TMRT." (*See id.* at ¶¶ 25–26.)

In a news wire announcement on January 19, 1999, Defendants stated that 2TheMart management included a "full team of operational, finance, marketing and technical personnel," that the web site was in "final development" and expected to be active by the second quarter of 1999 as a "preeminent" on-line auction site, and that the company had "retained the services of leading web site design and architecture consultants to design and construct the unique 2TheMart.com site." (*See id.* at ¶ 26.) Defendants made similar claims in a story released the following day on *Business Wire.* (*See id.* at ¶ 27.) The statements resulted in a rapid increase in the price of 2TheMart's stock from its closing price of $3.5 on January 18, 1999, to a close of $13 the following day. On January 20, 1999, the stock peaked at $50 before closing at $21.5. (*See id.* at ¶ 28; Pl. Suppl. Mem., Ex. B.)

On February 3, 1999, Defendants entered into an agreement with IBM to take the preliminary steps of identifying the business, technical and design requirements of the 2TheMart web site. (Compl. at ¶ 29.) Articles in the *Los Angeles Times* and *Orange County Register* asserted that "[m]ost new investors seem[ed] to have bought [2TheMart's] stock based solely on its news releases." (*Id.* at ¶ 35.) In order to provide additional information about 2TheMart, Defendants issued additional statements. On February 24, 1999, the company released a statement on *Business Wire* which stated that "2TheMart.com's business strategy will be to launch its E-commerce and person to person trading community in the second quarter of 1999," and that the web site was "currently in final development." (*Id.* at ¶ 39.) On March 1, 1999, Defendants also announced the addition of Chief Technology Officer Robert Allende. (*See id.* at ¶ 42.) In the same press release, the defendants again claimed that the site was in its "final development." (*Id.*)

On April 30, 1999, IBM delivered a "Phase 0 Solution Design" to Defendants which included a high level application design, budget planning estimate and schedule for implementation. (*See id.* at ¶¶ 49–50.) On June 1, 1999, Defendants signed a contract with IBM to design, build, and test their web site. This agreement gave a six month production plan for the completion of the site. (*See id.* at ¶¶ 29, 50.)

Defendants' August 26, 1999, public filing on Form 10 verified that IBM had not agreed to take the preliminary steps to set up the web site until February 2, 1999. The Form 10 filing also revealed that the preliminary plan would not be delivered to the defendants until April 30, 1999. Finally, the Form 10 filing also verified that the first contract between Defendants and IBM for the designing, building and testing of the web site was not entered into until June 1, 1999. (*See id.* at ¶¶ 43, 50.)

With regard to the proposal for development entered into on June 1, 1999, section 2.7 of the contract stated that the project schedule and production plan set October 8, 1999, as the target delivery date for the web site. (*See id.* at 50.)

In preparation for the Form 10 filing, an audit was to be performed and published by Deloitte and Touche, LLP, but was delayed when Deloitte and Touche severed its relationship with Defendants on July 15, 1999. (*See id.* at ¶¶ 59–60.) Ultimately, an audit published by Grant Thornton LLP stated that "[2TheMart] is not yet generating revenues and, as shown in the financial statements, has incurred losses in its development stage. Also ... the Company has incurred substantial obligations and will need to raise capital to complete its development activities. These factors, among others ... raise substantial doubt about the Company's ability to continue as a going concern." (*Id.* at ¶ 59.)

On February 18, 2000, Plaintiff Harrington on behalf of herself and all others similarly situated filed a Consolidated Amended Complaint alleging that Defendants violated the Securities Exchange Act of 1934 [between January 19, 1999 and August 26, 1999 ("Class Period")]. (*See id.* at ¶ 1.) On April 3, 2000, Defendants filed a motion to dismiss and a motion to strike portions of the complaint. Plaintiffs filed their opposition on April 24, 2000. Defendants filed a reply brief on May 8, 2000. At oral argument on May 15, 2000, the Court ordered supplemental briefing on the issues of causation with regard to the statements and the stock price and whether Defendants profited from the fraud. Plaintiffs and Defendants filed their supplemental briefs on May 19 and May 26, 2000, respectively.

### III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when the complaint fails to state a claim upon which relief can be granted. *See Fed.R.Civ.P.* 12(b)(6). A complaint fails to state a claim if it does not allege facts necessary to support a cognizable legal claim. *See Balistreri v.*

*Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir.1984).

■ In reviewing a Rule 12(b)(6) motion, the court must presume the truth of the factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995); *see also Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). Dismissal under Rule 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))(dismissal appropriate only where "plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *see also Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.1989). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the plaintiff's claim. *See Usher*, 828 F.2d at 561.

### IV. Analysis

■ In order to successfully state a claim of securities fraud under Rule 10b–5, Plaintiff must establish the following elements: (1) a misrepresentation, omission, or other fraudulent device, (2) the purchase or sale of securities in connection with the fraudulent device, (3) the defendant's scienter at the time of the misrepresentation or omission, (4) the materiality of the misrepresentation or omission, (5) justifiable reliance by plaintiff, and (6) damages. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. In their motion, Defendants allege that Plaintiffs' complaint must be dismissed because they fail to adequately state a claim of securities fraud. (*See* Mot. at 8.) Specifically, Defendants allege that Plaintiffs have failed to establish the ele-

ments of (1) scienter, (2) materiality of the alleged misrepresentations or omissions, and (3) justifiable reliance on the alleged misrepresentations or omissions. (*See id.*)

### A. Scienter

The Private Securities Litigation Reform Act (PSLRA) requires that for each misrepresentation or omission, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). With regard to pleadings in the context of Rule 10b–5 claims, the Ninth Circuit has held that a plaintiff need allege not only that scienter existed, but that the plaintiff must also set forth "what is false or misleading about the statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc).

The Ninth Circuit recently addressed the standard for pleading scienter in a securities fraud action. *See In re Silicon Graphics, Inc., Sec. Litig.*, 183 F.3d 970 (9th Cir.1999). In *Silicon Graphics*, the Ninth Circuit held that in order to establish scienter, the plaintiff must provide "strong circumstantial evidence of deliberately reckless or conscious misconduct" which is more than "mere recklessness." *Id.* at 974. The court stated further that it is "not enough for [plaintiff] to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness." *Id.* at 985. In *Silicon Graphics*, the Ninth Circuit upheld the district court's dismissal of the complaint because it did not meet the standard described above. *See id.* at 988. The court categorized the complaint as a list of conjectures of concerned investors and an effort to piece together past events in order to prove "fraud by hindsight." *Id.* (citing *Medhekar v. United States Dist. Ct.*, 99 F.3d 325, 328 (9th Cir.1996)).

The facts and the claims set forth in the complaint in the present case, however, are much more precise than those in *Silicon Graphics*. Plaintiffs have offered their version of the facts in much greater detail. The complaint alleges a clear disparity between the timing of the alleged misrepresentations and omissions and the signing of the various agreements between Defendants and IBM. (*See* Compl. at ¶¶ 26–27, 29, 31–34, 37, 39–40, 42–43, 48–49.) It is clear from the complaint that Plaintiffs are not seeking to engage in a "fishing expedition." Neither are they pleading fraud by hindsight. It appears to the Court that given the nature of the negotiations with IBM and the timing of the statements made by Defendants that there is strong circumstantial evidence of deliberate recklessness on the part of Defendants. Plaintiffs have specified which statements were allegedly misleading, the reason they were misleading and, where appropriate, the specific facts that inform their beliefs. *See* 15 U.S.C. § 78u–4(b)(1). Indeed, "strong circumstantial evidence" could not be more clearly depicted than the series of events described by Plaintiffs in the complaint.[1]

Therefore, taking the allegations in the complaint as true and construing them in a light most favorable to Plaintiffs, the Court concludes that Plaintiffs have offered strong circumstantial evidence of deliberate recklessness sufficient to establish the element of scienter.

### B. Materiality

A statement is material if "its disclosure would alter the 'total mix' of facts available to an investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Marksman Partners LP v. Chantal Pharmaceutical*

---

1. Furthermore, at oral argument, counsel for Defendants acknowledged the facts of the case may be open to several interpretations. It appears to the Court that one interpretation must be that Defendants acted with the requisite mental state to support a claim of fraud.

*Corp.*, 927 F.Supp. 1297, 1305 (C.D.Cal. 1996). In that regard, it appears to the Court that disclosure of the fact that Defendants had not yet entered into a contract with IBM to design and build the web site would certainly have been considered an important part of an investment decision by any shareholder. Indeed, the complaint includes a message posted on the Internet by Defendant Magliarditi in response to concerns communicated by a shareholder who apparently sought more information about the company's development. (*See* Compl. at ¶ 36.) Therefore, a disclosure regarding the status of Defendants' web site development would have been material as it was precisely the kind of information shareholders sought and would have altered the "total mix" of facts available to the public.

In their motion, however, Defendants argue that the alleged misrepresentations and omissions cannot be material because (1) they are forward-looking expressions of business projections and plans, or "puffery," and (2) that each public statement was qualified by a paragraph of cautionary language. (*See* Mot. at 18.)

**1. Forward-looking statement of business projections**

■ A forward-looking statement is defined in 15 U.S.C. § 78u–5(i)(1)(B), as a "statement of plan and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." The initial presumption in cases of securities fraud is that forward-looking statements of business projections or plans are not sufficient to form the basis of a securities fraud action because they are merely forecasts or expectations for the direction of the company. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 931–934 (9th Cir.1996). Courts have also held, however, that predictions can be regarded as facts within the meaning of anti-fraud provisions of federal securities law. *See Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 203–204 (5th Cir.1988), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329

(1988). Moreover, the misleading character of a statement is not changed by vagueness or ambiguity such that "puffery" may form the basis for a securities fraud claim. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.1996).

■ Defendants claim that each of their public statements regarding the development of the web site and their relationship with the design and architecture consultants were not statements of hard fact, but rather expectations. (*See* Mot. at 18–20.) They note that the statements represented that the web site was in "development," that they "expected" to have the web site up and running by the end of the second quarter and that it was their business "strategy" to meet these goals. (*See id.* at 19.)

■ Statements of expectation and belief are, however, actionable if "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994) (*quoting In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir.1993), *cert. denied,* 513 U.S. 917, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990)).

Of the three factors listed in *Kaplan,* the one most applicable in the present case is the second factor. It appears to the Court that Defendants had no reasonable basis to believe that the web site was in its "final development" stages when the statement was issued on January 19, 1999. The complaint states that the preliminary agreement between Defendants and IBM was not reached until February 2, 1999. Therefore, approximately two weeks lapsed from the date of the first news release until Defendants could reasonably believe that the web site was even in its *preliminary* development stage.

Furthermore, it is not clear to the Court how Defendants, who apparently lack technical expertise, could have reasonably believed that they could have successfully designed, built and implemented a web site that was intended to be "one of the largest preeminent online auction sites" that would compete with such established sites as eBay.com, in the course of the five months from the time of the news release to the end of the second quarter. The complaint is clear that Defendants announced the second quarter launch of the web site at least two weeks prior to commencing a *preliminary* relationship with technical consultants at IBM. (*See* Compl. at ¶¶ 26, 37–38.) The complaint also alleges that after receiving the design proposal on May 29, 1999, at which time Defendants had already learned that the launch date would not occur until October, the Defendants, in a news release dated June 4, 1999, announced their second contract with IBM stating that "IBM [had] been developing and constructing the 2TheMart.com web site since January 1999." (*See id.* at ¶ 55.)

Finally, the preliminary agreement reached on February 2, 1999, stated that IBM was merely retained to conduct a preliminary study of the design and construction of the web site and to establish a preliminary plan for the development of the web site, or "Phase 0 Solution Design" which would take eight weeks.[2] (*See id.* at ¶¶ 37–38.) At that point, it cannot be said that Defendants could reasonably believe that the web site would be completed by the second quarter as there was no indication by IBM of a projected launch date.

■ Furthermore, misstatements or omissions are actionable if the ultimate disclosure of information effects the market price of the security. *See In re Clearly Canadian Sec. Litig.*, 875 F.Supp. 1410, 1416 (N.D.Cal.1995). Here, the complaint states that the statements were material in that they had a demonstrated effect on 2TheMart's stock price. (*See* Compl. at

¶ 35.) In fact, the complaint quotes an article published on January 30, 1999, in the *Orange County Register* confirming the materiality of Defendants' misrepresentations. (*See id.*) "*Most new investors seem to have bought the company's stock based solely on its news releases,* in which it promises to launch a new person-to-person auction Web site within the next six months." (*Id.* emphasis added.)

Thus, construing the assertions in the complaint as true and in a light most favorable to Plaintiffs, it appears to the Court that the disclosures released by Defendants did in fact have an effect on the stock price and the trading tendencies of the investors. Therefore, the Court concludes that the statements described in the complaint are actionable as they are not forward-looking statements.

### 2. The bespeaks caution doctrine

■ Defendants also argue that because the representations contained in the news releases were accompanied by cautionary language, the statements cannot serve as the basis for liability for securities fraud. Defendants cite to *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994), *cert. denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995), *and cert. denied,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995), in support of the proposition. In *Worlds of Wonder*, the Ninth Circuit stated that statements that were qualified by "no assurances" language were not misleading and did not support a claim of securities fraud. *See id.* at 1413–14. In the present case, Defendants argue that each press release contained cautionary language that the statements were "forward looking." (*See* Mot. at 20–21; Ex. B, C.)

Plaintiffs, however, argue that the cautionary language issued along with the press releases offered no meaningful warning to the average investor. Plaintiffs argue that the statements lacked disclosure

---

**2.** In fact, the preliminary plan was not produced by IBM for Defendants until April 30, 1999, over twelve weeks after the agreement was signed.

of adverse facts known to Defendants at the time the statements were made and that the statements were so general that they were not modified for the specifics of each news release. (*See* Pl. Opp. at 13–14.)

It appears to the Court that the cautionary language included in the statements was insufficient to warn the average investor. The court in *Worlds of Wonder* stated that if "precise cautionary language . . . directly addresses itself to future projections, estimates, or forecasts," the statements will not give rise to a claim of securities fraud. *Worlds of Wonder*, 35 F.3d at 1413–14 (citation omitted). In the present case, the same cautionary language was used in each statement and states that whatever the preceding statement, it was a forward-looking statement.[3] Such language was insufficient to inform the public that they had not yet contracted with IBM to design and develop the web site when they stated that the web site was in its "final stages of development."

 "[B]lanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim." *Worlds of Wonder*, 35 F.3d at 1414. Furthermore, the issue of materiality is fact-specific and appropriately left to the fact finder. *See Basic*, 485 U.S. at 239–41, 108 S.Ct. 978. Therefore, taking the allegations in the complaint as true and construing them in a light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately pleaded the element of materiality to survive the present motion.

**C. Reliance**

 Defendants also argue that Plaintiffs fail to adequately plead reliance on the alleged misrepresentations and omissions. (*See* Mot. at 21–24.) Specifically,

Defendants argue that Plaintiffs' attempt to prove reliance via the fraud-on-the-market theory must fail because they cannot show that the over-the-counter market in which 2TheMart's stock traded was an "efficient market" as required under Rule 10b–5. (*See id.* at 22.)

Plaintiffs argue, however, that they are entitled to rely on the fraud-on-the-market theory in support of their claim of reliance on the alleged misrepresentations and omissions because they have adequately stated in their complaint that the over-the-counter market in which the stock was traded was in fact efficient.

 The United States Supreme Court has articulated the fraud-on-the-market theory in the following way: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers did not directly rely on the misstatements." *Basic, Inc. v. Levinson*, 485 U.S. 224, 241, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Ninth Circuit has adopted the test set forth in *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J.1989), in order to determine whether a fraud-on-the-market exists when stocks are traded in an over-the-counter market. *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000). In *Cammer*, the court identified the following factors as indicative of an efficient market: (1) the existence of an average weekly trading volume of one percent (substantial presumption of efficient market) or two percent (strong presumption of efficient market) of outstanding shares during the class period; (2) a significant number of securi-

---

**3.** The cautionary language that appeared with each statement read as follows:

Certain information and statements included in this release constitute "foward-looking statements" within the meaning of the [PSLRA]. Such forward-looking statements involve known and unknown risks, uncer-

tainties and other factors which may cause the actual results, performance, or achievements of the Company to be materially different from any future results, performance, or achievements expressed or implied in such forward-looking statements.
(Mot. at Ex. B.)

ties analysts following the company's stock during the class period; (3) the existence of numerous market makers; (4) the company's eligibility to file an S–3 Registration Statement (or, if ineligible, such ineligibility resulted from timing factors rather than a failure to meet the minimum stock requirements); (5) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F.Supp. at 1286–87. The court also noted that while each factor need not be alleged in order to give rise to the inference that the stock was traded in an efficient market, the fifth factor may be the most significant factor in determining market efficiency as it is "the essence of an efficient market and the foundation for the fraud on the market theory."[4] *Id.* at 1287.

In the present case, Plaintiffs have alleged facts in the complaint sufficient to establish the cause and effect relationship described in the fifth factor noted in *Cammer*. First, on January 19, 1999, Defendants released a statement that they had obtained $1.7 million in cash and other commitments and an additional $1.5 million from a private sale of shares. They also stated that the web site was in its "final development," that they anticipated a second quarter launch of the web site, and that they had retained the services of leading web design and architecture consultants. (*See* Compl. at ¶ 26.) The stock price then rose from a low of $3.5 on January 18, 1999, to $8.5 on January 19, 1999, to a trading high of $50 on January 20, 1999, before closing at $21.5.[5] (*See id.* at ¶¶ 27–28; Pl. Suppl. Mem., Ex. B.)

Secondly, on January 22, 1999, the *Los Angeles Times* published an article on 2TheMart's business plan which appeared to copy word for word the plan filed by eBay.com. The article also noted that the company's listed address was only a post office box and that the company's attorney offered that the web site would be launched in February or March. (*See* Compl. at ¶ 31.) In response to the article, Defendants released a statement touting the abilities and experience of Defendant Magliarditi on January 27, 1999. The statement represented that Defendants had secured funding for the final development of the web site and that it was in the process of finalizing engagements with a variety of design consultants. (*See id.* at ¶ 33.) The stock price rose from $10.875 on January 27, 1999, to a high of $17 before closing at $16.125 on January 28, 1999, which was an increase of over 60 percent. (*See* Pl. Suppl. Mem., Ex. B.)

Thirdly, on May 18, 1999, Defendants announced in a statement that 2TheMart had contracted with Exodus Communications and it had completed "the development of its technology road map for its global Internet operations." (*See* Compl. at ¶ 48.) The stock price rose from $26 to $36 in the next two days of trading. (*See* Pl. Suppl. Mem., Ex. B.) Fourth, on June 3, 1999, a *Bloomberg News* article reported on Defendant Magliarditi's and Rebeil's failure to receive a license to operate a casino from the Nevada Gaming Commission, Defendant Magliarditi's purposeful under-reporting of income in 1994 and his altered K–1 tax schedules, Defendant Rebeil's diversion of company funds to finance the construction of his personal residence and Magliarditi's guilty plea to allegations of a conflict of interest as an attorney. (*See* Compl. at ¶ 52.) In response to this news article, the company's

---

**4.** The court stated later in its decision that "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price. However, ... such a sharing ... would require exploration of materiality and causation issues." *Cammer*, 711 F.Supp. at 1291.

**5.** During the same time period, the stock traded on a volume that increased from 7,200 on January 18, 1999, to 99,500 the following day and 244,400 on January 20, 1999. (*See* Pl. Suppl. Mem., Ex. B.)

stock price fell from $22.75 on June 2, 1999, to $15.5 on the following day amid a heavy trading volume of 324,700 shares. (*See* Pl. Suppl. Mem., Ex. B.) Fifth, when Defendants announced on June 10, 1999, that the launch of the web site would be delayed until October, the stock price fell three points on heavy trading. (*See id.*) Finally, on August 26, 1999, Defendants filed their Form 10 which revealed that they needed to raise additional funds. (*See* Compl. at ¶ 63–64.) At the news of financial difficulties, the company's stock plunged 37 percent to $7.3125 on heavy trading of 412,000 shares. (*See* Pl. Suppl. Mem., Ex. B.)

The Court concludes that the facts alleged in the complaint are plainly sufficient to allege a cause and effect relationship between disclosures of unexpected events and an immediate response in the stock price.[6] Therefore, Plaintiffs have fulfilled the fifth factor in the *Cammer* test and, thus, have adequately pleaded the element of reliance.[7]

Thus, it appears to the Court that Plaintiffs have sufficiently alleged the elements of a claim of securities fraud at this stage in the proceedings.[8]

### D. Defendants' Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that in its answer to the pleadings, the moving party may request that the court "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Immaterial" means that the matter has no bearing on the controversy before the court. *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993) *rev'd on other grounds*, 510

U.S. 517, 534–35, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). If there is *any doubt* as to whether the allegations might be an issue in the action, courts will deny the motion. *See id.* "Impertinent" has been defined as allegations that are not responsive or irrelevant to the issues that arise in the action and which are inadmissible as evidence. *See id.* "Scandalous" includes allegations that cast a cruelly derogatory light on a party or other person. *See Skadegaard v. Farrell*, 578 F.Supp. 1209, 1221 (D.N.J.1984).

In the present case, Defendants request that the Court strike several portions of the complaint that make reference to either the past activities of Defendants Magliarditi and Rebeil, the circumstances of the separation of Defendants and Deloitte and Touche, or the "reverse merger." (*See* Mot. to Strike Mem. at 1–2.)

Just as with a motion to dismiss for failure to state a claim, the Court must view the pleadings in a light most favorable to the pleading party. *See California v. United States*, 512 F.Supp. 36, 39 (N.D.Cal.1981). As such, it appears to the Court that the mere fact that the publishing of the articles regarding the past activities of Defendants and their separation with Deloitte and Touche appears to have caused the stock price to fall is relevant to the issue of the materiality of the allegations in the complaint as discussed above. Additionally, a brief history of 2TheMart's development may be relevant and admissible if the proper foundation is provided.

Therefore, it appears to the Court that an element of doubt exists as to whether the allegations in question may be at issue

---

**6.** The Court notes that Plaintiffs appear to have satisfied the first factor in the *Cammer* analysis, as well. The weekly average of the volume of shares traded is 272,989 during the class period, which is more than one percent of the outstanding shares.

**7.** In reaching its decision on the element of reliance based upon the *Cammer* analysis, the Court need not address Plaintiffs' argument in favor of a presumption of reliance under *Affil-*

*iated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

**8.** In examining the complaint and other materials submitted by the parties and taking the allegations as true and construing them in a light most favorable to the non-moving party, the Court also concludes that Plaintiffs have sufficiently alleged facts tending to show Defendants' profit motive.

966

as the action progresses. Thus, Defendants' motion to strike is denied.

## V. Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs have adequately pleaded each of the elements of a claim for securities fraud and that the portions of the complaint challenged in the motion to strike may be at issue in the action. Thus, Defendants' motion to dismiss for failure to state a claim and motion to strike are denied.

IT IS SO ORDERED.